MEMORANDUM OF DECISION

WILSON, Judge.
Plaintiff instituted this civil action to recover damages for personal injuries sustained in a fall on premises under the control of the defendant, Mohegan Tribal Gaming Authority (MTGA). Jurisdiction is conferred by the Mohegan Torts Code, MTO 2001-07, which expressly waives the Defendant’s sovereign immunity from suit.
I.
Plaintiffs amended complaint alleges that on August 7, 2002 at about 10:00 p.m., he was a patron at the Mohegan Sun Casino, a gaming enterprise operated by the defendant on the Mohegan Reservation of the Mohegan Tribe of Indians of Connecticut. At that time, he alleges he was walking from one parking lot to another on a foot path, “pursuant to directions he received from a Mohegan Sun employee, and was required to walk down a steep slope. The Plaintiff went down the slope, and fell halfway down the slope breaking his leg ...” [1] He alleges that his injuries were caused by the defendant’s negligence in that it (a) allowed the steep slope to exist knowing of its “dangerous propensities”; (b) failed to remedy the “dangerous condition” created by the steep incline of said slope; (c) failed to warn the plaintiff and other business patrons of the “dangerous condition”; (d) knew or should have known of the “dangerous condition” and failed to take appropriate measures to avoid the probability of harm; (e) failed to erect barricades; (f) failed to provide steps; (g) allowed the surface of the slope to be slick and slippery and “dangerously unsafe”; (h) failed to provide adequate lighting; (i) allowed wood chips and other debris to remain on the slope; (j) failed to warn the plaintiff of the presence of wood chips and other debris; (k) failed to properly train its employees in proper maintenance and care of the slope; (l) and failed to warn the plaintiff of the presence of concrete debris on the slope.
The defendant denied that the plaintiff fell while following “directions he received from a Mohegan Sun employee.” The defendant also denied that it was negligent in any of the respects alleged by the plaintiff, and affirmatively alleged that the plaintiff was himself comparatively negligent in that he: proceeded to walk down an embankment which was clearly not designed as a pedestrian walkway; elected to accept the obvious risks of descending a landscaped embankment; failed to follow alternative routes; and failed to use reasonable common sense and judgment. These allegations of comparative negligence were denied by the plaintiff.
II.
At trial, the plaintiff testified on his own behalf. His was the only testimony the plaintiff offered. The plaintiff was a credible witness; indeed defendant’s counsel *563 readily agreed that the plaintiff is a credible, upstanding person. The plaintiff is a British citizen who has resided in Italy for thirty years where he teaches English for the Italian State School. He and his wife periodically visit the United States and did so in August 2002, at which time they paid a visit to the Defendant’s casino. On the day in question, while his wife was gambling, the plaintiff decided to walk about the premises, and then to return to his car. When he went to the garage where he remembered parking the car, “there was no car; and so I was rather worried,” he testified. After looking for his car for 10 to 15 minutes, and not finding it, he returned to the casino and spoke to an employee. The person he spoke to had a badge and the plaintiff associated him as an employee of the casino because of the badge and, “perhaps maybe he had a uniform.” This person was inside the entrance to the casino, very near the garage and the plaintiff, assuming him to be an employee, told him that he couldn’t find his car. The employee responded[2] that there was a possibility that the ear had not been stolen and that the plaintiff might have left it in another parking garage. He told the plaintiff that he should go to the other garage and that the way to get to the garage was extremely simple—that all that the plaintiff had to do was to exit the casino, and walk along the path, and he would get to the other garage where in all probability his car was situated. At that time, the plaintiff was not certain which entrance he had come in, or which garage he was in when he had looked for the car and couldn’t find it. The plaintiff testified that the employee did not exactly give directions to the plaintiff, but rather pointed him in a direction, telling him to follow this particular path and that he would get to the second parking lot where probably his car was situated. The plaintiff did not have any trouble finding the path and was onto the path in two or three minutes. He traversed it for perhaps five minutes when he came to a fork. The plaintiff went right, for no particular reason except that the casino was to the right. He walked along the right fork and found himself atop a grassy bank where the path ended. At that point: “I looked and (sic) the path and my priority was to get to the other parking garage as quickly as possible. And it didn’t seem to be a big problem and so I decided to descend the little hill.” There was no path and “as I descended the slope, all of a sudden I found myself sitting. And I felt some pain in my leg ... I do remember seeing a piece of building debris ... ”, He continued to try to get to the second garage at the bottom of the slope. When he arrived at the garage he started to look for his car, but his leg was hurting so much that he returned to the casino. There, he requested assistance, which was provided, and he was transported to a local hospital for treatment for a broken left leg.
The foregoing is the substance of the plaintiffs direct testimony bearing on the issue of liability. Cross examination and subsequent testimony disclosed that the plaintiff on subsequent visits to the casino tried to find the path in question and the location of the fall but that he has been unable to do so. When the plaintiff reached the end of the path he did not opt *564 to go back to check out the left fork because he “was in a hurry to get to the garage and so to go back would have meant to lose—to waste time, and lose time.” He was in a hurry because he was afraid the car had been stolen; (as it turned out, the car wasn’t stolen and it was exactly where it was supposed to be— the plaintiff had been looking for it in the wrong place.) No employee recommended to him that he walk down the grassy slope. The plaintiff does not know why he fell; the slope did not seem to be so much of a problem, and he does not know if the chunk of building debris that he saw was the cause of the fall.
The plaintiff testified at his deposition | which was admitted as a full exhibit] that when he spoke with the first employee, thinking that his car had been stolen, he was under stress and that when he is under stress he has problems of “confusion, mental confusion, and this spills over into the physical side.” He was “alarmed” and he was “getting a little bit panicky about his car.” The plaintiff also testified that the light conditions were very good.
On redirect, the plaintiff testified that the employee who pointed out the direction of the path to him did not give him any particular warnings, and that there were no warnings, signs, postings, or barricades concerning the right fork. He also testified, however, that, looking at each of the two forks in the path, “neither had a dangerous aspect.”
Both parties introduced a number of photographs at trial. The court finds that these photographs are not relevant because of the lack of evidence which connects them to the site of the path in question, or of the fall, or any other material questions.
The defendant produced the ambulance report which related that the “patient states while walking on mulch outside the casino entrance, patient’s feet slid out from under him causing him to land on his buttocks . . .” the plaintiff disputed that portion of the exhibit as refers to “mulch,” testifying that at that time, he did not know what the word “mulch” meant in America, and it was no part of his vocabulary. In any event, the plaintiff did not know what it was that caused him to fall. He testified “I don’t know why I fell. At the time, the slope didn’t seem so much of a problem. I don’t know why I fell.”
III.
This case is governed by the Mohegan Torts Code.
The Mohegan Torts Code, MTO 2001-07 is the exclusive remedy for the recovery of damages in tort. It provides in relevant part that a “tort” means an injury to a person caused by a breach of a legal duty to that person; a “duty” means an obligation to conform to a particular standard of conduct; and that “negligence” means conduct that falls below the standard established by law or custom for the protection of others against unreasonable risk of injury or harm. The standard of conduct to which a person must conform to avoid being negligent is that of a reasonable person under similar circumstances. Sec. 5.A.8, 15, 20. The code also provides that a claimant shall recover nothing if his contributory negligence is determined to be greater than fifty-percent (of any negligence of the Defendant.) Sec.9.E.
The Constitution of the Mohegan Tribe provides that “to the extent that tribal law does not otherwise govern á dispute, the Gaming Disputes Court may apply relevant provisions of Connecticut law.” Article XIII Sec. 1. Further, the Ordinance Establishing the Gaming Disputes Court provides, inter alia, that “the substantive law of the Mohegan Tribe ... *565 shall be: ... (c) The common law of the State of Connecticut ... except as such common law is in conflict with Mohegan Tribal Law.” MTO 95-4, Article III, Sec. 301(c). The common law of the State of Connecticut with regard to the duty of occupiers of land to invitees is well established: “The defendant owes the duty to invitees to exercise reasonable care to keep the premises reasonably safe for reasonably anticipated uses.” Wright, Fitzgerald & Aukerman, Connecticut Law of Torts, Sec. 49 (3d Ed.1991). The Connecticut common law in this respect is not in conflict with Mohegan law and is frequently applied in cases of this nature, e.g., Tipton v. MTGA, 1 G.D.R. 22, 23, 1 Am. Tribal Law 408, 1998 WL 35281212 (1998).
It may be of interest to the plaintiff, a British subject, that the Connecticut, and hence Mohegan, common law derives from English common law. In Indermaur v. Davis, L.R. 1 C.P. 274 (1866) the English Court of Common Pleas affirmed the rule that an occupier of land owes to an invitee the duty to exercise reasonable care to make the premises safe for him, because he came on business which concerns the occupier, and upon his invitation, express or implied. If the defendant breaches that duty, and causes injury to the invitee, the defendant is liable to pay damages to the plaintiff for such injury.
In this case, it is undisputed that the plaintiff was an invitee to whom the defendant owed such a duty. It is also undisputed that the plaintiff fell on premises ¡Under the defendant’s control and that he sustained personal injuries as a result of that fall. At issue is whether the defendant breached any duty to the plaintiff ¡which caused the fall.
It is first noted that the plaintiff has not (established the specific cause of his fall; he has not identified any specific defective condition which caused him to fall. Indeed he testified forthrightly that he does not know what caused his fall. In this, the case differs from cases such as Momini v. MTGA, 2 G.D.R. 62 (2004), where a specifically identified condition caused the plaintiff to fall.
Rather, the specification of negligence in the complaint is predicated, either explicitly or implicitly, on the existences of “dangerous condition” or “dangerous propensities” on the slope. It is therefore incumbent upon the plaintiff to prove such allegations.
The term “dangerous condition” is not defined in MTO 2001-07, although it was defined in its predecessor, MTO 98-1:
“Section 2 ...(g) ‘Dangerous Condition’ means a physical aspect of a facility or use thereof which constitutes an unreasonable risk to human health or safety, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent acts or omissions of the Mohegan Tribal Gaming Authority in constructing or maintaining such facility. For the purposes of this subsection, a dangerous condition should have been known to exist if it is established that the condition had existed for such a period of time and was of such a nature that in the exercise of reasonable care, such condition and its dangerous character should have been discovered.”
In the absence of a definition in MTO 2001-07 the court is guided by the common law definition of “dangerous” as “attended with risk; perilous; hazardous; unsafe.” Blacks Law Dictionary, 471. Although not mandated by the ordinance, this definition is consonant with that contained in the previous ordinance, MTO 98-1. Regardless of the particular definition of “dangerous,” the ultimate burden on the plaintiff is *566 to prove the defendant “negligent” as previously defined in MTO 2001-07, supra.
 The burden of proof upon the plaintiff in eases of this nature is two-fold. “First, he must offer evidence sufficiently describing the condition complained of, so as to afford a reasonable basis in the evidence for a finding that a defective condition, in fact, existed; and, secondly, to offer evidence from which the trier could reasonably conclude that the defendant had notice of this condition and failed to take reasonable steps to remedy it after such notice. Esposito v. Hospital of St. Raphael, 142 Conn. 95, 97, 111 A.2d 545. Drible v. Village Improvement Co., 123 Conn. 20, 23, 24, 192 A. 308.” Holden and Daly, Connecticut Evidence 116, 117. The court concludes that the plaintiff has failed to prove either aspect of this two-fold burden.

THE “DIRECTIONS” RECEIVED FROM THE DEFENDANT’S EMPLOYEE

The complaint alleged, and the defendant denied, that at the time the plaintiff was injured he was acting “pursuant to directions he received from a Mohegan Sun employee.” The plaintiff has argued that because he was following these “directions” at the time he was injured, that the defendant is liable for his injuries. The court rejects this argument. First, the evidence[3] disclosed that the employee did not in fact give “directions” in the usual meaning of the term. Rather the plaintiff, in a somewhat upset frame of mind, told the employee that he couldn’t find his car; the employee responded “that there was a possibility that my car hadn’t been stolen and that in fact I’d left it in another parking garage ... He said that I should go to the other parking garage and that the way to get to the garage was extremely simple. That all I had to do was to exit the casino, to walk along the path, and I got—and I would get to the other garage where in all probability my car was situated.” The plaintiff then added that these were “not exactly directions. He pointed me in a direction.” The plaintiff then came to a fork in the path and he chose to go right, for no particular reason except that the casino was on the right. (Why the plaintiff chose the fork toward the casino and not toward the garage was not explained.) The plaintiff testified that the two forks did not have a “dangerous aspect.” When the plaintiff saw that the right fork ended at a grassy bank, he knew he had the option to go back and check out the left fork, but he did not do that because he was in a hurry to find his car. Considering the evidence as a whole, the court is not persuaded that there was any negligence on the part of the employee. Rather, it appears that the employee was trying to be helpful in reassuring the plaintiff that he would be able to find his car and point out the general direction of the garage.

THE ANGLE OF THE SLOPE

The plaintiff alleges and seemingly argues that the slope was “steep” and that somehow the “steepness” of the slope was a “dangerous condition” which caused the plaintiffs fall. (Allegations of negligence in the complaint Para. 5.a.-f.). The Court disagrees. There was no evidence of the angle or “steepness” of the slope, or of the dimensions or conditions of the inclined surface. The plaintiff testified that the hill “did not seem to be a big problem and so I decided to descend the little hill.” Also, “1 didn’t consider the pitch to be of any great problem.” He considered the hill to be *567 “not particularly” high. “I think not in vertical height, but in the angled height, it must have been about three meters.” (It was explained what was meant by “angled height”). The Court holds that the plaintiff failed to prove that the slope was dangerous because of the incline or any conditions associated with the incline, or that the defendant was negligent in allowing the slope to exist. Therefore, there was no condition to be remedied, or which required any warning, or other measures, or which required the erection of barricades or barriers, or the provision of steps.

CONDITIONS ON THE INCLINE

The plaintiff also alleges (in paragraphs 5.g.—1.) that the defendant was negligent in maintaining or allowing certain conditions on the incline. Again, the Court concludes that the plaintiff' has not proven these allegations. There was no evidence that the surface was “slick and slippery.” There was no evidence of a failure to provide adequate lighting. To the contrary, the plaintiff testified that the light conditions were very good. There was no evidence of “wood chips and other debris” on the slope, except for the reference in the ambulance report to the plaintiff “walking on mulch outside casino entrance pt’s feet slid out from under him causing him to land on his buttocks.” The plaintiff however, disputed using the word “mulch,” stating that this term was not in his vocabulary, and he was absolutely sure that he never mentioned that word. He then responded to the question “Was there any kind of what you now know to be mulch or chips, wood chips of any kind? A. Maybe. I don’t know.” With respect to building debris on concrete debris, the plaintiff testified that the “slope didn’t seem to be much of a problem. I don’t know why I fell. I stated before that I found myself sitting next to a chunk of building debris. I’m not going to say I fell over that because I don’t know and it would be dishonest to say so. Q. Go ahead. Finish please. A. But that could be the case. That would be one of the reasons for me falling. I don’t know.” Even if the court, were to assume (which it cannot do under the law related to the burden of proof) that the plaintiff tripped over the “chunk of building debris,” there was no evidence as to how the debris got there, or how long it had been there, or that the defendant had any notice, actual or constructive, of the presence of the debris. Therefore, there was no proof that the defendant was negligent in placing the debris on the slope, or in permitting or allowing it to remain there, or in failing to remove it or warn of its presence.
Therefore, the plaintiff has not proven that wood chips or other debris or concrete debris contributed to any condition of the property or to the cause of the plaintiffs injury.
Finally, there is no evidence whatever of any negligence in the training of the defendant’s employees with regards to the slope.

CONCLUSION

This case is quite unlike the English case of Indermaur v. Davis, L.R. 1 C.P. 274 (1866) cited supra. There, a journeyman gasfitter came to the defendant’s sugar refinery to test a patent gas regulator installed there by his employer. He fell down an open and unguarded shaft in the floor, and was injured. The condition there was unquestionably dangerous, ie., “attended with risk; perilous; hazardous; and unsafe.” No similar condition has been identified here as the cause of the plaintiffs fall.
Based on all of the evidence the court must conclude that the plaintiff has failed to establish that the slope on which the *568 plaintiff fell was in a dangerous condition or had dangerous propensities, or that the defendant was negligent in any of the respects alleged in the complaint. Because of this conclusion, judgment must enter for the defendant, and there is no need to determine any percentage of comparative negligence of the plaintiff.

IV.

For the foregoing reasons, the Court finds the issues for the defendant.
Judgment may enter for the defendant.

. By stipulation of the parties, the Court granted a Motion to Bifurcate the liability issues from the medical issues. Therefore, the trial was limited to issues of liability.. The defendant did not dispute that the plaintiff broke his leg as a result of the fall, but no medical evidence was presented.

. The defendant's hearsay objection to the : question of what the employee said was overruled by the Court for two reasons: one, the statement was not offered into evidence to ; establish the truth of the matter asserted; therefore it was not hearsay. Connecticut : Code of Evidence § 8-1(3); and two, even if it contained “hearsay” it was nevertheless admissible under the exception to the hearsay rule allowing the statement by a party opponent. Id. at § 8-3( 1). The employee had, at least to the plaintiff, apparent authority to speak.

. Assuming that he was an employee authorized to speak. See FN 2 supra.